**Affirmed and Memorandum Opinion filed March 26, 2026**



**In The**

# Fifteenth Court of Appeals

### NO. 15-24-00079-CV

**KENEDY COUNTY WIDE SCHOOL DISTRICT, Appellant**

**V.**

**KELLY HANCOCK, TEXAS COMPTROLLER OF PUBLIC ACCOUNTS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, Appellee**

**On Appeal from the 353rd District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-23-002042**

## OPINION

Texas law requires statewide equity in the collection of school taxes and the distribution of school funding. Yet property appraisals for tax purposes are generally set at the local level by a county appraisal district (CAD) and a county appraisal review board (ARB).[1] If local officials set appraisals too low, that

---

[1]    *See* TEX. TAX CODE §§ 6.01, 6.41.

directly *reduces* local revenues, but can unfairly *increase* state funding intended to aid "property-poor" districts.

To ensure that local appraisals do not inequitably shift the burdens or benefits of school funding from one county to others, Texas law requires the Comptroller[2] to conduct a study to review different levels of property appraisal across all school districts in Texas. The statute at issue here requires that study to "ensur[e] that different levels of appraisal resulting from protests" decided by a local ARB "are appropriately adjusted in the study."[3]

In response to protests filed in 2021 by owners of large ranches covering most of Kenedy County, the local ARB adopted substantially lower appraisals for native pasture land than did the local CAD. The Comptroller disagreed, and his study adopted a substantially higher appraisal. The only school district in the county objected, arguing that unless the state appraisal figures were reduced to the local ARB figures, it would be penalized by lower local revenues *and* lower state funding.

But the express purpose of the Comptroller's study is to discourage unfairly low ARB appraisals by requiring that they be "appropriately adjusted" to figures the Comptroller determines are more realistic. Discretion to determine whether such an adjustment is "appropriate" is delegated to the Comptroller, and is dispositive if supported by substantial evidence. As the Comptroller's study meets that standard here, we affirm the district court's judgment in favor of the Comptroller.

---

[2]     Kelly Hancock was automatically substituted as a defendant when his predecessor, Glenn Hegar, ceased to hold office. *See* Tex. R. App. P. 7.2(a). "Comptroller" in this opinion refers generally both the previous and current state officials and their actions.

[3]     TEX. GOV'T CODE § 403.302(b)(4).

2

# BACKGROUND

**The unique aspects of property appraisals in Kenedy County**

Kenedy County is one of the most sparsely populated counties in the United States. About 350 people live within its 1,458 square miles of land—roughly 4 square miles for each man, woman, and child.[4] The great majority of the county is private ranchland, including fabled ranches like the King Ranch and other famous and historic properties.[5]

Appellant Kenedy County Wide Common School District ("the District") is a public school district covering almost all of Kenedy County, with a single elementary school campus serving about 100 students in the primary grades.[6] Like other public schools in Texas, it is funded largely by local property taxes, with supplemental state funding available for property-poor districts.[7] While lower local appraisals can unfairly shift school funding from local taxpayers to the State, in the case of Kenedy County two unique constraints—one legal and one practical—complicate these appraisals.

First, there is very little commercial, residential, or industrial property. As one witness testified: "There is not a gas station [or] a store in Kenedy County." The

---

[4]     UNITED STATES CENSUS BUREAU, *QuickFacts: Kenedy County, Texas* (population estimate as of July 1, 2024), https://www.census.gov/quickfacts/fact/table/kenedycountytexas/INT100223.

[5]     SOAH-004829 ("There's six or seven ranches that make up well over 72–3, 75 percent of the total land mass of this county … they include people that are historically known across Texas, the Kenedy Foundation, the Kenedy Trust, the King Ranch, the Bass Ranch, the Armstrong Ranch.").

[6]     KENEDY COUNTY-WIDE COMMON SCHOOL DISTRICT, *District Information*, https://www.saritaschool.net/our-district-home (last visited Mar. 17, 2026). Graduates move on to secondary schools in the Riviera Independent School District area. KAUFER EARLY COLLEGE HIGH SCHOOL, *Recruitment Plan, Events, and Timeline*, https://web.archive.org/web/20220628043507/https://www.rivieraisd.us/site/handlers/filedownload.ashx?moduleinstanceid=332&dataid=884&FileName=KECHS%20Recruitment%20Plan%20Events%20and%20Timeline.pdf.

[7]     *See Morath v. Sterling City Indep. Sch. Dist.*, 499 S.W.3d 407, 408 (Tex. 2016).

parties agree that all 556,840 acres in dispute here—representing 70 percent or more of the County—represent "qualified open-space land" devoted to grazing and hunting,[8] and are administratively categorized as "native pasture" rather than "irrigated cropland, dry cropland, improved pasture, orchard, [or] waste."[9] The Texas Constitution and Tax Code limit appraisals of such lands for tax purposes to their productive capacity, not market value.[10] This protects farms and ranches from taxation based on what the land would *sell* for rather than how it is actually *used*, but at the same time reduces the revenues schools receive from local taxes.[11]

Second, property is appraised by local people. County appraisal districts (CAD) issue initial assessments,[12] and county Appraisal Review Boards (ARBs) decide protests about them.[13] Officers of both these government entities must be local residents.[14] With fewer than 400 residents in Kenedy County, and with "the largest employers in the county" being the large ranches and the school district, the work of local appraisal officials is particularly challenging here since they will likely know everyone who pays the ranches' school taxes and the students and school staff who rely on them.[15]

---

[8]       TEX. TAX. CODE § 23.51(1).

[9]       *Id.* § 23.51(3) ("In classifying land according to categories, the chief appraiser shall distinguish between irrigated cropland, dry cropland, improved pasture, native pasture, orchard, and waste.").

[10]      TEX. CONST. art. VIII, § 1-d-1 ("To promote the preservation of open-space land, the legislature shall provide by general law for taxation of open-space land devoted to farm, ranch, or wildlife management purposes on the basis of its productive capacity."); *see also* TEX. TAX CODE § 23.41(a) ("Land designated for agricultural use is appraised at its value based on the land's capacity to produce agricultural products.").

[11]      For example, the Kenedy County ARB found the *market* value of the Armstrong Ranch was over $30 million, but its taxable *productive* value was less than $3 million.

[12]      TEX. TAX. CODE § 6.01.

[13]      *Id.* § 6.41.

[14]      *See id.* §§ 6.03(a-1), 6.0301(d), 6.41(d).

[15]      By comparison Harris County has 190 ARB members as of January 1, 2026, reducing the

4

**The Property Value Study required by state law**

It is state policy that the burden of school taxes and the benefit of state financial aid must be equitably distributed.[16] To implement that policy, state law requires the Comptroller to conduct a "Study of School District Property Values" ("the Study") to determine "the total taxable value of *all* property in *each* school district."[17] With over 1,200 school districts in the state, this daunting task must be conducted every two years for districts whose appraisals were found valid in the most recent Study, and annually for those where they were not.[18] If local appraisals vary more than five percent from the Comptroller's appraisal in the Study, a series of administrative and judicial procedures ensue to reconcile them.[19] If local appraisals continue too low through a two-year grace period (as was the case here), the Comptroller's higher values are certified to the commissioner of education and may reduce state supplemental funding.[20]

Consistent with the constitutional restrictions, the Study appraises open-space land based on productivity value.[21] State law requires valuation using an income approach looking at the five years before the taxing year, and "capitalizing the average net income the land would have yielded under prudent management from production of agricultural products."[22] Net income of each farm, ranch, or pasture is

---

potential for conflicts. Board of Directors of the Harris Central Appraisal District Resolution No. 2025-09 (2025), https://hcad.org/assets/uploads/pdf/resources/2025/Boardbook-September-17-2025-meeting.pdf.

16      TEX. GOV'T CODE § 403.301.

17      *Id.* § 403.302(a) (emphasis added).

18      *Id.* § 403.302(a-1).

19      *Id.* § 403.303.

20      *Id.* § 403.302(c), (g), (h), (j).

21      *Id.* § 403.302(a).

22      TEX. TAX CODE § 23.41(a).

not easily gathered, and in any event the relevant figures are not *actual* net income but estimated net income "under prudent management"; thus such appraisals involve some judgment and discretion. State law authorizes the comptroller to "promulgate rules specifying the methods to apply and the procedures to use in appraising land designated for agricultural use,"[23] and provides for the necessary data by authorizing "an annual farm and ranch survey for purposes of estimating the productivity value of qualified open-space land."[24] School districts, appraisal districts, and other governmental entities must "promptly comply with an oral or written request from the comptroller for information to be used in conducting" the Study.[25]

### The Procedural Background in Kenedy County for 2021

The parties largely agree on the facts here. In 2021, the local CAD assessed the productivity value of native pasture in Kenedy County at $100 per acre. Nine ranch owners representing 556,840 of the 642,971 total acres of native pasture in the County (86.60%) filed protests with the local ARB, which reduced those appraisals by 15.31% overall to $84.69 per acre.

The Comptroller's 2021 Study for Kenedy County disagreed with both the CAD and the ARB, appraising native pasture in the county at $105.20 per acre. The District filed a protest asking the Comptroller to reduce his appraisals in the Study to match those ordered by the ARB.[26] The Comptroller referred the case to the State Office of Administrative Hearings ("SOAH") for a hearing,[27] and an Administrative Law Judge entered a proposal for decision that recommended the Comptroller reduce the values in the Study to match the ARB's $84.69 per acre.

---

[23]     *Id.* § 23.41(b).

[24]     TEX. GOV'T CODE § 403.3022.

[25]     *Id.* § 403.304(a).

[26]     *See id.* § 403.303.

[27]     *See id.* § 403.303(e).

The Comptroller rejected that recommendation, redlining the ALJ's proposal to delete several findings and affirming the Study's appraised values instead. The District filed this administrative appeal in Travis County district court,[28] alleging the Comptroller's order was arbitrary and not supported by substantial evidence. Following a hearing on the matter, the trial court agreed with the Comptroller and affirmed the finding of values in the state Study. This appeal followed.

## DISCUSSION

Section 403.302(a) of the Texas Government Code requires the comptroller to conduct the Study "to determine the total taxable value of all property in each school district." With 1,200 school districts, 11 million housing units, and hundreds of thousands of business and mineral interests in the state as of 2020,[29] a comprehensive *individual* appraisal of all property in each school district is physically impossible. Instead, subsection (b) of the same statute includes four subdivisions authorizing the Comptroller to use standard appraisal techniques like sampling and statistical analysis to ensure the Study's accuracy and address different levels of appraisal that may distort its results.[30] The sole dispute in this case concerns subdivision (b)(4), which states:

> (b) In conducting the study, the comptroller shall determine the taxable value of property in each school district: … (4) ensuring that different levels of appraisal resulting from protests determined under Section 41.43, Tax Code, are appropriately adjusted in the study.

Section 41.43 of the Tax Code governs tax appraisal protests that property owners file with a local ARB. The question is what—if anything—§ 403.302(b)(4) requires the

---

[28]    *See id.* § 403.303(d).

[29]    UNITED STATES CENSUS BUREAU, *Texas Added Almost 4 Million People in Last Decade* (Aug 25, 2021), https://www.census.gov/library/stories/state-by-state/texas.html.

[30]    *See* TEX. GOV'T CODE § 403.302(b)(1)–(4).

7

Comptroller to do to "appropriately adjust" property values in the Study when ARB orders produce "different levels of appraisal." The parties cite no caselaw construing this 30-year-old statute, so this is a case of first impression.[31]

A specific standard of review applies when a school district challenges the findings in the Study in court:

> The court shall remand the determination to the comptroller if on the review the court discovers that substantial rights of the school district have been prejudiced, and that: (1) the comptroller has acted arbitrarily and without regard to the facts; or (2) the finding of the comptroller is not reasonably supported by substantial evidence introduced before the court.[32]

Potential prejudice to the District's substantial rights is not disputed, as the Study's values would reduce the District's state funding by about $250,000, cutting it in half. Nor does the District contest the calculations in the Study, having stipulated below that they were "accurately calculated and would otherwise reflect the correct value" *but for* the failure to adjust them for substantially lower appraisals found by the local ARB. Specifically, the District asserts the Comptroller (1) must reduce the open-space productivity values in the Study "to account for value reductions ordered by the ARB"; and if not, (2) the Comptroller's appraisal of $105.20 is not supported by substantial evidence. These are questions of law we review de novo.[33]

---

[31] The only case addressing the section was dismissed for lack of standing. *See Morath v. La Feria ISD*, 2018 WL 6729850, at *7 (Tex. App.—Austin Dec. 21, 2018, no pet.).

[32] TEX. GOV'T CODE § 403.303(d).

[33] *See Baumgardner v. Brazos River Auth.*, 714 S.W.3d 597, 601 (Tex. 2025) (statutory construction); *Save Our Springs All., Inc. v. Tex. Comm'n on Env'tl Quality,* 713 S.W.3d 308, 320 (Tex. 2025) (substantial evidence). Under the facts here, the standards in the statute do not appear to differ from the general standards governing statutory construction and substantial evidence review.

## I. Must productivity values in the Study be adjusted for ARB orders?

The District argues that the ALJ correctly interpreted the statute: the Comptroller must reduce the value of native pasture land included in the Study by 15.31% to match the ARB's overall reduction on native pasture land in the 91 property-specific orders it issued here. The Comptroller rejected that proposal, finding subdivision (b)(4)'s instruction to make adjustments resulting from ARB orders applies *only* to appraisals based on market value, and *cannot* apply to appraisals based on productivity value like those here. We agree with the District that the text of the statute does not support any such exception. That text provides:

> (a) The comptroller shall conduct a study using comparable sales and generally accepted auditing and sampling techniques to determine the total taxable value of all property in each school district. The study shall determine the taxable value of all property and of each category of property in the district and the productivity value of all land that qualifies for appraisal on the basis of its productive capacity and for which the owner has applied for and received a productivity appraisal . . .

> (b) In conducting the study, the comptroller shall determine the taxable value of property in each school district:

>> (1) using, if appropriate, samples selected through generally accepted sampling techniques;

>> (2) according to generally accepted standard valuation, statistical compilation, and analysis techniques;

>> (3) ensuring that different levels of appraisal on sold and unsold property do not adversely affect the accuracy of the study; and

>> (4) ensuring that different levels of appraisal resulting from protests determined under Section 41.43, Tax Code are appropriately adjusted in the study.

Nothing in (b)(4) says that open-space land is to be treated any differently than any other type of property. As this case shows, owners can appeal productive-value appraisals to an ARB just like market-value appraisals, and (b)(4) does not suggest that appeals of one should be treated differently than appeals of the other.

The Comptroller makes a different textual argument based on the term "taxable value" used in the introductory phrase of subsection (b), claiming that it incorporates a distinction stated in subsection (a). Subsection (a) requires the Comptroller to "determine the *taxable value* of all property and of each category of property in the district and the *productivity value* of all land that qualifies for appraisal on the basis of its productive capacity."[34] The Comptroller argues that the use of separate terms in (a) means that the term "taxable value" in (b) must exclude land taxed on productive value.

"But the first rule of case law as well as statutory interpretation is: Read on."[35] "Taxable value" is expressly defined in subsection (d) of the same statute to mean "the market value of all taxable property" *less* a long list of exclusions and exemptions where full market value is not taxable, such as residential homesteads, reinvestment zones, and properties damaged by disasters.[36] Among those exclusions is subdivision (d)(7), which says that "taxable value" means market value *less* "the difference between the comptroller's estimate of the *market value* and the *productivity value* of land."[37] By definition, subtracting *any difference* between market value and productivity value will *always make the two the same*.[38] This is not surprising; while some property is appraised on its market value and other property is appraised on its productivity value, in every case land is appraised on the value at which it can be taxed. Owners of open-space land

---

34      TEX. GOV'T CODE § 403.302(a).

35      *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012).

36      TEX. GOV'T CODE § 403.302(d).

37      *Id.* § 403.302(d)(7).

38      This appears to be undisputed. *See* Comp. Br. at 18 n.9 ("This is a just another way of saying that in these cases the taxable value *is* the productivity value."); KCSD Br. at 4 (citing "Appellee's admission that taxable value of the properties at issue is their productivity value.").

may appeal appraisals of the productivity value of land to a local ARB,[39] and since those protests are "determined under Section 41.43 [of the] Tax Code,"[40] subdivision (b)(4) applies.

There may be good reasons to exclude open-space land from the adjustments directed by (b)(4), but those reasons cannot overcome what the statute says, or permit us to assign the law a meaning contrary to its text.[41] Whether to remove open-space land from the Comptroller's (b)(4) duty is a question for the Legislature, which has shown more than usual interest in this Study by amending § 403.302 and § 403.303 more than 40 times since 1995, fine-tuning them in each of the previous 15 regular sessions and three special sessions besides. We, accordingly, leave the legislating to the legislators.

## II. What adjustment is "appropriate"?

While (b)(4) does not exclude open-space land from "appropriate adjustment," it does not require adjustment that matches any ARB order dollar-for-dollar. The text of (b)(4) provides that if different levels of appraisal result from ARB orders, they must be "appropriately adjusted" by the Comptroller in the Study.[42] While the passive voice used in (b)(4) obscures things a little, the subjects that (b)(4) says must be "appropriately adjusted" are the "different levels of appraisal," not the state appraisals that the Comptroller's data supports. How

---

[39]     *See* TEX. TAX CODE § 41.41(a)(1) ("A property owner is entitled to protest before the appraisal review board … in the case of land appraised as provided by Subchapter C … determination of its appraised or market value."); *id*., Subchapter C, § 23.41(a) ("Land designated for agricultural use is appraised at its value based on the land's capacity to produce agricultural products.").

[40]     *See id*. § 41.43(a) (providing rules for "a protest authorized by Section 41.41(a)(1)").

[41]     *See In re Jorden*, 249 S.W.3d 416, 422 (Tex. 2008) ("If Parliament does not mean what it says, it must say so.").

[42]     TEX. GOV'T CODE § 403.302(b)(4).

much adjustment is *appropriate* will depend on what is needed to correct the existing differences in levels of appraisal.

Any other construction would be inconsistent with the purpose of the Study, which is expressly stated in the statute:

> It is the policy of this state to ensure equity among taxpayers in the burden of school district taxes and among school districts in the distribution of state financial aid for public education. The purpose of this subchapter is to promote that policy by providing for uniformity in local property appraisal practices and procedures and in the determination of property values for schools in order to distribute state funding equitably.[43]

"When a statute expressly states a legislative purpose," the statutory context "necessarily includes the Legislature's codified purpose."[44] Here, the Study will never promote uniformity in determining property values for schools if it must *incorporate*, instead of adjust, "different levels of appraisal resulting from [ARB] orders."[45]

Section 403.302 does not define "appropriate," but its ordinary meaning is "especially suitable or compatible; fitting."[46] It implies discretion,[47] and in the form "appropriately adjusted" often appears in property appraisal laws,[48] reflecting that

---

[43] *Id.* § 403.301.

[44] *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 730 (Tex. 2024).

[45] TEX. GOV'T CODE § 403.302(b)(4).

[46] *Appropriate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).

[47] *See e.g.*, TEX. R. CIV. P. 13 ("If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b"); *id.* R. 42(c)(2)(A) ("For any class certified under Rule 42(b)(1) or (2), the court may direct appropriate notice to the class."); *id.* R 120a(4) (providing that if the court sustains the objection to personal jurisdiction, "an appropriate order shall be entered."); *id.* R. 166 (providing for pre-trial conferences "[i]n an appropriate action"); *id.* 190.4(b)(3) (providing for "appropriate limits on the amount of discovery").

[48] *See, e.g.*, TEX. GOV'T CODE § 403.302(j); TEX. TAX CODE §§ 23.013(c), 41.43(b)(3), 42.26(a)(3).

no two properties are exactly alike.[49] By providing for the Comptroller to "appropriately adjust" different levels of appraisal due to ARB orders, the Legislature granted that discretion to the Comptroller and not to the courts, which can step in only if that discretion is abused.[50] Under the standard of review here, we find that the values in the Study are reasonably supported by the following substantial evidence appearing in the record.[51]

By law, productive capacity "is determined by capitalizing the average net income the land would have yielded under prudent management from production of agricultural products during the five years preceding the current year,"[52] and must use "accepted income capitalization methods applied to average net to land."[53] It defines "net to land" as income that would be due to the owner under a typical lease (including hunting leases) for the previous five years (2015–19 here), *less* expenses directly attributable to the use of the land.[54] The Code defines "income capitalization" as dividing this net-to-land amount "by the capitalization rate to determine the appraised value."[55]

The Comptroller presented evidence at SOAH from Kenedy County appraisers that typical lease income countywide of native pasture was as follows:

---

[49]     *See Valero Ref.-Tex., L.P. v. Galveston Cent. Appraisal Dist.*, 519 S.W.3d 66, 74 (Tex. 2017) ("[E]very piece of real estate is unique.").

[50]     TEX. GOV'T CODE § 403.303(d).

[51]     *Id.* ("The court shall remand the determination to the comptroller if on the review the court discovers that substantial rights of the school district have been prejudiced, and that: (1) the comptroller has acted arbitrarily and without regard to the facts; or (2) the finding of the comptroller is not reasonably supported by substantial evidence introduced before the court.").

[52]     TEX. TAX CODE § 23.41(a).

[53]     *Id.* § 23.52(a).

[54]     *Id.* § 23.51(4).

[55]     *See id.* § 23.51(5) ("'Income capitalization' means the process of dividing net to land by the capitalization rate to determine the appraised value.").

- for 2015, $3.00 per acre to lease native pasture, $7.50 per acre for hunting leases;

- for 2016, $4.00 per acre for native pasture, $12.50 per acre for hunting;

- for 2017, $5.00 per acre for native pasture, $12.50 per acre for hunting; and

- for 2018 and 2019, $5.00 per acre for native pasture, and $13.50 per acre for hunting.

The Comptroller also submitted over 1,300 pages of detailed spreadsheets listing typical expenses *for every county* in Texas (including Kenedy) for five years, including common expenses for native pasture like brush control (186 pages); fencing (190 pages); hunting lease expense (272 pages); water and irrigation (146 pages); and school, county, and hospital district taxes (554 pages).

Total income and expenses per acre for 2015 through 2019 were then carried into a summary for Kenedy County, each year's expenses were subtracted from each year's income to yield "net to land" for each year, and all five were added together and divided by 5 to yield an average net-to-land of $10.52 per acre for the five-year period. Capitalizing that income using the statutory cap rate of 10 percent,[56] the Comptroller appraised the open-space land at issue in the County at $105.20 per acre.[57]

This is the only evidence on an "appropriate adjustment" in the record. The ARB orders were offered in evidence, but they provide no figures or explanation to reduce productivity values by 15 percent other than the statement: "The appraisal records are not correct and should be changed."[58] Without any explanation, this "is conclusory and no evidence."[59]

---

[56] *See id.* § 23.53.

[57] *See id.* § 23.51(5) ($10.52 per acre ÷ 0.10 = $105.20 per acre).

[58] *See, e.g.*, SOAH-00370, -00374, -00378, -00382, -00386, -00390, -00394, -00398, -00402, -00402, -00406, -00410, -00414, -00418, -00422, etc.

[59] *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 161 (Tex. 2012).

The dissent would keep this case bouncing around the executive, administrative, and judicial branches by remanding it back to the beginning after a three-year trek. But when this odyssey began, the District voluntarily stipulated that the Comptroller's "assigned values were accurately calculated and would otherwise reflect the correct value." As the District presented *no* evidence of an "appropriate adjustment" other than a mandatory reduction per the ARB orders, it failed to carry its burden to prove that the Comptroller's finding on value was made "without regard to the facts" or "is not reasonably supported by substantial evidence introduced before the court."[60]

## CONCLUSION

We recognize that the Study puts the District in a financial bind not of its own making. The local CAD appraised the land here at $100 per acre, and the District could not appeal that appraisal. It was the ranch owners that appealed to the ARB, and won a reduction to $86.49 per acre, reducing their property taxes more than $9 million in the aggregate. One of the District's experts stated his opinion that Kenedy County has "been held back by the people that own the big ranches. And that's not a negative, that's just the way they wanted it and that's where it is." But regardless of the cause or local effects, the only issue before us is whether substantial evidence supports the Comptroller's conclusion that the ARB orders here represent "different levels of appraisal resulting from protests" that he was required to appropriately adjust according to the Study. Accordingly, we affirm the trial court's judgment that the final Comptroller's Decision dated March 9, 2023 should be affirmed.

---

[60] TEX. GOV'T CODE § 403.303(d).

15

/s/ Scott A. Brister
Scott A. Brister
Chief Justice

Before Chief Justice Brister and Justices Field and Farris.

Dissenting Opinion by Justice Farris.